J. F. GIOIA, INC., APPELLANT, *v.*
CARDINAL AMERICAN CORPORATION,
APPELLEE.

(No. 48830—Decided January 28, 1985.)

*Sindell, Sindell & Rubenstein* and *Lewis Einbund,* for appellant.

*Kahn, Kleinman, Yanowitz & Arnson Co., L.P.A.,* and *Bernard J. Stuplinski,* for appellee.

MARKUS, P.J. The plaintiff-corporation appeals from a judgment denying it an easement by prescription or by necessity for an unpaved driveway on its neighbor's property. Plaintiff does not challenge the ruling that it obtained no easement by necessity, but it disputes

the ruling which denied it any prescriptive right. Substantial credible evidence supports the trial court's findings of fact, and those findings support the judgment. Hence, we are obliged to affirm that judgment.

## I

In 1902, the Halbritters acquired land which included a twenty-acre rectangular plot that was later divided into the three parcels involved in this litigation:

The westerly boundary for this total plot fronted approximately six hundred thirty-three feet along Richmond Road in Bedford. The northerly and southerly boundaries extended back from Richmond Road approximately six hundred eighty-eight feet.

In 1927, the Halbritters conveyed one acre (parcel #1) to the Wintours, while retaining the other nineteen acres (parcels #2 and #3). Parcel #1 extends eighty feet along Richmond Road and approximately five hundred forty-five feet back from the roadway. Shortly thereafter, the Halbritters established a private airport on their remaining land, with a grass runway on parcel #3 and a hangar on parcel #2. Persons interested in activities at that airport used a dirt and slag drive along the northerly edge of parcel #3 to reach the runway and the hanger. That driveway is approximately forty feet wide. It is entirely within parcel #3, though it borders parcels #1 and #2.

In 1936, the Wintours reconveyed parcel #1 back to the Halbritters, who retained the entire plot until 1951 when they conveyed parcel #1 to the Seithers. The Seithers resided on parcel #1. They maintained their private driveway from the airport access drive on parcel #3 to their garage on parcel #1. Their garage driveway was parallel to Richmond Road and roughly one hundred feet back from that road.

In 1959, the Seithers sold parcel #1 to the Continenzas. At some undetermined time in the 1950's, while the Seithers owned parcel #1, the Halbritter's discontinued their airport operations. Thereafter, some unidentified people periodically used the airport access drive to go to the airport area in order to fly model planes there.

From 1959 to 1966 the Continenzas resided on parcel #1. Presumably, they continued to use the airport access drive on parcel #3 to reach their garage driveway on their own property. Additionally, Mr. Continenza operated a welding business near the front of his parcel, and later a recreational "go cart" business further back on his parcel. His customers used the previously established airport access drive to reach those businesses. At times, Mr. Continenza parked his own and customers' vehicles at various locations on the airport access drive opposite parcel #1. On a few occasions, he parked vehicles on the airport access drive opposite parcel #2, which the Halbritters' successors still owned.

In 1966, the Continenzas conveyed parcel #1 to the plaintiff. Plaintiff's president testified that at various times he used different parts of the access drive on parcel #3 to move and park heavy equipment and to store supplies. He operated plaintiff's construction business from the house on parcel #1. Consequently, he also used the access drive on parcel #3 to reach the garage driveway for parcel #1.

Meanwhile, the Halbritter family

had transferred both parcels #2 and #3 to their agent in 1955. The Halbritters' agent conveyed those parcels to American Screw Corporation in 1957, and that company retained parcels #2 and #3 until 1973.

The Chief Executive Officer for American Screw testified that in 1968 he contacted the plaintiff which then owned parcel #1. He said that he discussed the deteriorated condition of the access drive on parcel #3 with plaintiff's president, and their mutual interest in using it. American Screw had difficulty moving its heavy equipment from the hangar on its parcel #2 over the rutted access drive on its parcel #3. The American Screw official testified that he authorized the plaintiff to use the access drive on parcel #3 if the plaintiff would improve its condition and maintain it.

The plaintiff's president denied that any such discussion occurred, but he acknowledged his efforts to improve and maintain the drive. The trial court's findings expressly accepted the testimony of the American Screw official, despite the plaintiffs' president's denial.

American Screw retained parcels #2 and #3 until 1973 when it merged into Lamson and Sessions Company. A few months later, the new corporate entity sold plaintiff parcel #2, which occupies approximately one-fourth acre. Thereafter, plaintiff stored some of its trucks in the hangar on parcel #2. Plaintiff's president testified that it now utilized the access drive on parcel #3 to service its use of that hangar. He said it also continued its previous use of that drive for other purposes related to its business on parcel #1.

On January 1, 1976, American Screw and the plaintiff executed a formal "License Agreement" by which American Screw licensed plaintiff to use the access drive. Plaintiff's legal counsel represented plaintiff's president in negotiations which led to that agreement and recommended that he sign it. The License Agreement provided:

"1. The parties now agree that Licensor [American Screw] is the owner of the property [access drive] outlined in red on the sketch attached hereto as Exhibit A and incorporated herein by reference (the 'Property') and the Licensee [plaintiff] is the owner of various vehicles and construction equipment, including but not limited to, dump trucks, graders, and tractors, (the 'Equipment'), part of which Equipment is currently parked upon and all of which is frequently driven across the Property.

"2. Licensor [American Screw] and Licensee [plaintiff] now agree that the encroachment of the Equipment and Licensee's use of the Equipment over and upon the Property shall be deemed to be with the express license and consent of the Licensor to the intent that Licensee shall not acquire any easement or right in respect to the Property. Licensor agrees that Licensee may continue the encroachment of the Equipment and the use of the Equipment over and upon the Property subject to the provisions herein.

"3. Licensee [plaintiff] agrees to maintain the slag driveway currently running across the Property and to keep the Property clean and presentable. Licensee further agrees that it shall not construct any permanent improvements on the described property, except for such improvements as are necessary to maintain the aforesaid slag driveway.

"4. Licensee [plaintiff] agrees to cease any further dumping of rubbish either on the Property or on any adjoining real property of Licensor.

"5. Licensee [plaintiff] shall remove the Equipment and cease use of the Equipment over and upon the Property six (6) months after Licensor shall have given to Licensee a notice in writing in that regard, and every such notice shall be sufficient if left at the above written principal office of

Licensee although not addressed to any person by name or description.

"6. This License shall be automatically and immediately revoked and made void without any notice or other action being required of Licensor [American Screw] upon the occurrence of any of the following:

"(a) Licensee [plaintiff] conveys or transfers to another party its real property abutting and contiguous to the Property;

"(b) Licensor [American Screw] conveys or transfers to another party any of its real property outlined in blue on the attached Exhibit A; or

"(c) Licensee [plaintiff] breaches any of its covenants hereinbefore set forth.

"7. If Licensee [plaintiff] fails to remove the Equipment and/or fails to cease use of the Property within the six (6) months described in paragraph 5 hereof, or within fifteen (15) days after the automatic revocation and voiding of this License pursuant to paragraph 6 hereof, Licensee agrees that Licensor (or in the situation described in paragraph 6 (b) hereof, Licensor's successor or assign) may remove the Equipment from the Property and/or take such other action it seems [sic] appropriate to terminate Licensee's encroachment and/or use of the Property."

In 1979, American Screw merged into Lamson and Sessions Company. The new corporate entity sold the remaining parcel #3 to the defendant, after first notifying plaintiff to discontinue its use of the access drive on that property. When defendant acquired title to parcel #3, it began negotiations with plaintiff about terms and conditions for plaintiff's continued use of the access drive. Plaintiff complied with defendant's request that plaintiff's general liability insurance policy list defendant as an additional insured for the access drive area. However, the parties reached no further agreement.

On January 2, 1980, defendant's corporate counsel notified plaintiff by letter that plaintiff's use of the drive on parcel #3 was an unauthorized encroachment. The letter directed that plaintiff's further use of that drive should "cease immediately." Further negotiations ensued. Finally in 1983, defendant served plaintiff with a formal notice to vacate that area and a subsequent eviction complaint.

Plaintiff responded by filing this action which sought a permanent injunction against defendant's interference with plaintiff's "sole use and enjoyment of and control over the slag driveway." Plaintiff's complaint also asked for:

"[A]n order declaring that the Plaintiff has an easement of that strip of land known as the slag driveway * * * and that plaintiff's easement rights in and to said slag driveway be quieted against any claim or interest of the Defendant."

At the outset of this case, plaintiff sought and obtained an order staying the municipal court eviction action which defendant had filed a few days earlier. The court ultimately denied plaintiff's requests for relief and granted judgment that "Defendant's interest in said driveway is quieted against any claim of Plaintiff."

II

Plaintiff's first assignment of error disputes the trial court's finding that plaintiff acquired no prescriptive easement:

"The trial court erred in finding that plaintiff-appellant did not acquire prescriptive easement rights in the driveway as plaintiff-appellant and its predecessors in interest made adverse, open and notorious use of the driveway under claim of right for a continuous period of twenty-one years with the knowledge of defendant-appellee and its predecessors in interest, thereby acquiring an easement by prescription."

A landowner obtains an easement by prescription for a specific use of his

neighbor's property when he uses that property in that manner (a) openly, (b) notoriously, (c) adversely to the neighbor's property rights, (d) continuously, and (e) for at least twenty-one years. Cf. *Griffiths* v. *Schaefers* (App. 1954), 72 Ohio Law Abs. 79, 80; *Ericson* v. *Grenga* (App. 1952), 70 Ohio Law Abs. 504, 506.

The party claiming a prescriptive easement has the burden of proving each of those elements. *McInnish* v. *Sibit* (1953), 114 Ohio App. 490, 492-493 [19 O.O.2d 476]; cf. *Trattar* v. *Rausch* (1950), 154 Ohio St. 286 [43 O.O. 186], paragraph seven of the syllabus (same rule for implied easements by necessity). Society generally prefers that traditional recordable conveyances control the status of titles for real property interests. Some courts base prescriptive easements on a fiction that long usage evidences a written conveyance that was later lost. Consequently, a party asserting this quasi-equitable claim to reform the record title for realty may have an obligation to establish his claim by clear and convincing evidence. *McInnish* v. *Sibit, supra*, at 494; but, see, *Demmitt* v. *McMillan* (1984), 16 Ohio App. 3d 138 (a preponderance of the evidence usually satisfies the claimant's burden).

Manifestly, this plaintiff did not use the disputed area for any purpose during a twenty-one year interval. This plaintiff owned the adjoining property only seventeen years when it filed this suit. Plaintiff owned the adjoining property only two years when the neighbor who owned the disputed area reportedly made arrangements for plaintiff to use it. Plaintiff executed a formal license which expressly disclaimed any adverse interest in the disputed area when it owned the adjoining property less than ten years.

However, this plaintiff seeks to aggregate or "tack" its adverse use with its antecedent's adverse use to satisfy the twenty-one year continuous use requirement. To do so, plaintiff must establish that (a) persons in privity, (b) sequentially and continuously used the disputed property, (c) in the same or similar manner, (d) openly, (e) notoriously, (f) adversely to the title holder's interests, and (g) for at least twenty-one years. See Restatement of the Law, Property (1944), Section 464; *Zipf* v. *Dalgarn* (1926), 114 Ohio St. 291, paragraph two of the syllabus.

No neighboring property owner used the disputed access drive area before the Halbritters created the drive in approximately 1927. Since the Halbritters owned the entire plot with all three parcels from 1936 to 1951, no adjoining property owner used the access drive adversely to them during those years. One cannot use property adversely to one's own interests. See 2 Thompson, Real Property (1980 Repl.), Section 348. Halbritters' ownership of the entire plot between 1936 and 1951 disrupted the continuity for any adverse use which any adjoining property owner might have commenced before 1936.

After 1951, Seithers, Continenzas and plaintiff sequentially owned parcel #1. After 1973 plaintiff also owned parcel #2. The evidence to show similar adverse use of the access drive by these three sequential landowners was meager. The trial court found that their use was not concurrently open, notorious, and adverse to the owners of the access drive. However, we need not determine whether the evidence required a contrary finding, unless their use continued adversely for at least twenty-one years.

The trial court resolved conflicting testimony to decide that plaintiff accepted its neighbor's oral license to use the neighbor's access drive in 1968. Since there was credible testimony to that effect, we should affirm this factual finding. See *Seasons Coal Co.* v. *Cleveland* (1984), 10 Ohio St. 3d 77, 81; *Dickman* v. *Moore* (1961), 114 Ohio App. 243, 244 [19 O.O.2d 113]. Plaintiff thereby ended any adverse use.

By accepting its neighbor's permission to use the drive, plaintiff accepted the neighbor's superior right and abandoned adversity for that property. Cf. *Glass* v. *Barnett* (App. 1946), 47 Ohio Law Abs. 323, 325; *Pagel* v. *Reyman* (Colo. App. 1981), 628 P. 2d 166, 168-169; see Restatement of Property, *supra,* Section 458, Comment to Clause (a). That action extinguished any maturing prescriptive right by destroying the continuity between any prior adverse use and any subsequent adverse use. See Thompson on Real Property, *supra,* Section 347; Restatement of Property, *supra,* Section 459, Comment (1)(b).

Plaintiff also seeks to aggregate or tack public use of the access drive. Unlike some other jurisdictions, Ohio recognizes that the public can acquire an easement by prescription without a private dedication or a public acceptance. *Railroad Co.* v. *Roseville* (1907), 76 Ohio St. 108, 117-118; *Smith* v. *Krites* (1950), 90 Ohio App. 38, 42 [46 O.O. 360]. For this purpose, the ownership of the parcels has no significance because the public's adverse use does not necessarily service any particular adjoining property. However, public usage would not give this plaintiff any property right in the disputed access drive. Cf. *Thornley Land & Livestock Co.* v. *Morgan Bros. Land & Livestock Co.* (1932), 81 Utah 317, 17 P.2d 826. If the public's adverse use continued long enough to establish a public easement, all members of the public would have equal usage rights.

As in the case of prescriptive easements which serve adjacent property, a public prescriptive easement results from a specific type of continuous use. The resulting easement permits the public to continue that same type of use. In effect, a landowner who forebears from effectively disrupting use of his property by his neighbor or the general public eventually accedes to the continuation of that same use. An adjacent landowner's extended use of his neighbor's land as a roadway does not justify its later use to reach a different property or as a drainage ditch. Cf. *Perrin* v. *Sethman* (App. 1930), 8 Ohio Law Abs. 723; *Ericson* v. *Grenga, supra.* The public's extended use of property for picnics and recreation may not create an easement to drive vehicles there.

In this case, plaintiff relies on evidence that at scattered times the public drove or parked on the access drive (a) to reach the Halbritters' airport, (b) to reach the businesses operated by the Continenzas and the plaintiff, (c) to turn their cars around, (d) to fly model airplanes, (e) to assist police traffic surveillance, and (f) for evening amatory activity. No adverse public use resulted when the public utilized the access drive to reach a specific business adjacent to it. Cf. *Pennsylvania RR. Co.* v. *Donovan* (1924), 111 Ohio St. 341, 349-351.

Use by business invitees or licensees serviced that business on the adjacent property. Those users asserted no independent right to employ the access drive. They presumably acted in the belief that the business with which they dealt had authority to permit their use of the access route. For prescription purposes, their use constituted use by the landowners where the business functioned. Thus, the public's use of the access drive to reach the Halbritters' airport constituted use by the Halbritters. Likewise, public use to service the businesses operated by the Continenzas or the plaintiff constituted use by those landowners for their businesses.

The evidence in this case fell far short of showing any regular, continuous, public activity on the access drive for independent public purposes. No public prescriptive right results from occasionally parked lovers, police cars, or model plane flyers. No evidence showed the frequency, the location, or the duration of such activities. Plaintiff's complaint did not claim a

public easement, the evidence would not support such a finding, and the court made no such ruling.

## III

Plaintiff's second claimed error disputes the trial court's assignment of the burden of proof:

"The trial court erred in finding that use of the driveway by plaintiff-appellant and its predecessors in interest was permissive, as defendant-appellee failed to establish by a preponderance of the evidence that such use was permissive."

Plaintiff relies on syllabus language in *McInnish* v. *Sibit, supra,* to support its contention that defendant had the burden to show allegedly adverse use was permissive. For Ohio intermediate appellate courts, the syllabi have no legal significance or precedential value. The opinion in *McInnish* assigns to the party claiming a prescriptive easement the burden of proving "all the elements necessary to establish his right." *McInnish* v. *Sibit, supra,* at 493. Quoting from *First-Central Trust Co.* v. *Lopez* (App. 1940), 37 Ohio Law Abs. 197, the *McInnish* opinion specifically requires the claimant to prove that his use and his predecessors' use " ' "were adverse, under a claim of right, exclusive, continuous, and uninterrupted." ' " *Id.* at 493.

The *McInnish* opinion then discusses the same court's earlier decision in *Manos* v. *Day Cleaners & Dyers, Inc.* (1952), 91 Ohio App. 361 [48 O.O. 455]. In *Manos,* the court said in paragraph one of the syllabus but not in the opinion that a landowner who contests a claimant's proof of a prescriptive easement has:

"* * * [T]he burden of proving that the use of the land was under some license, indulgence, neighborly accommodation or special contract * * *."

In *McInnish,* the court at 493 rephrased the contesting landowner's obligation to mean:

"[T]hen the owner must dispel the apparent right of the claimant to the use of the lands by showing that such use was inconsistent with a claim of right on the part of the one asserting an easement."

In effect, *McInnish* recognized the burden of rebuttal which a landowner faces when contesting apparently adequate proof of a prescriptive easement. Evidence that the users acknowledged the landowner's superior right by acting with the landowner's permission rebuts evidence that their use was adverse under a claim of right. Thus, the landowner who contests the prescription claim has no true burden of proof regarding the adverse or permissive nature of the claimant's use. Rather, the landowner has a burden of rebuttal to dispel the claimant's persuasive proof that the usage was adverse to the landowner's rights. Cf. *Klunk* v. *Hocking Valley Ry. Co.* (1906), 74 Ohio St. 125; *Brunny* v. *Prudential Ins. Co.* (1949), 151 Ohio St. 86 [38 O.O. 533].

The trial court in this case found that plaintiff failed to prove his claim by clear and convincing evidence, or by a preponderance of the evidence. That finding sufficiently resolved any conflict between the claim that specific prior use was adverse or permissive. Some competent credible evidence supports that finding, so we should accept it.

## IV

Finally, plaintiff argues anticipatorily about the significance of its 1976 written license agreement with American Screw, which then owned the access drive area.

"In the event defendant-appellee raises the license agreement as a defense, this court must find that the prescriptive easement acquired by plaintiff-appellant is unaffected by a subsequent license issue [*sic*] by the owner of the servient estate."

As plaintiff correctly contends, a user's acknowledgment that the title

40

holder has the paramount right will not extinguish a fully matured prescriptive easement. See *Crossman* v. *Foster* (1932), 44 Ohio App. 78, 80; *Burgess* v. *Sweet* (Mo. App. 1983), 662 S.W. 2d 916. After the prescriptive easement results from prior adverse use, the user does not forfeit the established easement by acting as if it did not exist.

However, a prescriptive easement can be extinguished by the title owner's obstruction of the easement in an open, notorious, adverse, continuous manner for at least twenty-one years. See Restatement of Property, *supra*, Section 506, Comment *b*; cf. *Kougl* v. *Curry* (1950), 73 S.D. 427, 44 N.W. 2d 114, 118. In other words, an easement can be created by another's sufficient adverse use, and it can be destroyed by the title owner's sufficient adverse restriction on such use.

Plaintiff's contention has no significance here. The trial court did not find that the 1976 license extinguished a previously matured prescriptive easement. The landowner-defendant makes no such claim in this court. At the same time, the 1976 license has considerable significance as an admission by the plaintiff that no prescriptive easement had previously matured. While plaintiff described the 1976 agreement as a "tragic mistake," the trial court could well give it substantial weight as rebuttal for plaintiff's claims. Plaintiff's execution of the 1976 license agreement with the advice of its own legal counsel directly contradicts its claims about the property's prior usage.

We overrule each of plaintiff's assignment errors and affirm the trial court's judgment.

*Judgment affirmed.*

JACKSON and NAHRA, JJ., concur.