DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment entered by the Washington County Common Pleas Court, upon a jury verdict, in favor of Helen Perry and Sheila Perry Jarrells, plaintiffs below and appellees herein, on their various claims against John W. Dearth and Sharon S. Dearth, defendants below and appellants herein. The following errors are assigned for our review:
FIRST ASSIGNMENT OF ERROR:
 "THE JURY ERRED IN FINDING THAT APPELLANTS DID NOT OCCUPY THE LAND TO THE POSTS FOR MORE THAN 21 YEARS PRIOR-TO SUIT BEING FILED ON JANUARY 15, 1998."
SECOND ASSIGNMENT OF ERROR:
 "THE JURY ERRED IN FINDING THAT THE SURVEY OF TOM SCHULTHEIS WAS THE CORRECT SURVEY INSTEAD OF THE SURVEY OF ROB SCHELL."
THIRD ASSIGNMENT OF ERROR:
 "THE JURY ERRED IN IGNORING THE EVIDENCE RELATING TO THE FIELD DRAIN PIPE THAT HAD BEEN INSTALLED YEARS BEFORE BY THE COMMON OWNER OF THE LAND."
FOURTH ASSIGNMENT OF ERROR:
 "THE JURY ERRED IN IGNORING THE EVIDENCE CONCERNING THE OUTFALL LINE FROM APPELLANTS SEPTIC TANK ACROSS THE PERRY PROPERTY TO THE CREEK."
FIFTH ASSIGNMENT OF ERROR:
 "THE COURT ERRED IN OVERRULING APPELLANTS MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT."
SIXTH ASSIGNMENT OF ERROR:
 "THE COURT ERRED IN DENYING APPELLANTS MOTION FOR A NEW TRIAL."
The record reveals the following facts pertinent to this appeal. A number of years ago, Helen Perry (appellee) and her husband Arthur bought 160 acres of land in Barlow Township, Washington County, Ohio.[1] They subdivided a portion of that property over the years and transferred four (4) one and a quarter (1 1/4) acre lots to their children.[2] One of those lots was given to their daughter, Sheila Urschel (n/k/a Sheila Jarrells) (appellee) and her husband. The Urschels were divorced in the early 1970s and the lot was ordered to be sold as part of those proceedings. On October 18, 1972, that property was transferred to John and Sharon Dearth (appellants).
The Dearths and the Perrys lived next door to one another without incident for a number of years and, by all accounts, lived amicably for most of that time.[3] Arthur Perry passed away in 1988 and in July of that year his widow, Helen Perry, prepared a deed conveying an additional 2.677 acres of land (including the home on the original 160 acre tract) to their daughter. However, because Sheila was going through another divorce at the time, the deed was not recorded until ten (10) years later.
In the mid to late 1990s, appellees began observing some problems with their property. Ms. Jarrells was out walking near the 2.677 acre tract one day when she noticed a number of drainage pipes leading to her property from the Dearth's land. Jarrells had not noticed these drainage pipes prior to this time. She and her mother (Ms. Perry) also began detecting the foul odor of "stinky" stuff in the creek at the back of their land. Further investigation revealed that the Dearth septic system discharged water into the creek.[4] It was also discovered that a small "knoll" at the back of the Jarrells land had been excavated and the dirt removed by appellants in order to fill in a culvert on their property.
In 1997, Sheila Jarrells commissioned a survey and, when completed, erected a fence approximately four (4) inches inside what the surveyor determined to be her property line. Apparently, once Jarrells erected this boundary, it was further discovered that appellants had built a garage which extended onto Jarrells land by several inches.[5]
Appellees commenced the action below on January 16, 1998, alleging conversion of topsoil (from excavation of the "knoll") and a continuous, ongoing, trespass onto their property as a result of the garage encroachment, the septic tank discharge into their creek and the drainage pipes emptying onto their property.[6] They asked for compensatory damages in the amount of $25,000, punitive damages in the amount of $100,000 and an order requiring appellants to remove the encroachments.
The Dearths filed an answer denying liability and asserting a variety of defenses including, inter alia, "license" and adverse possession. They also counterclaimed alleging acquisition of prescriptive easements for drainage and discharge of their septic system as well as acquisition, by adverse possession, of a one (1) foot strip of land running along their joint border. Appellants also averred that they had been given permission to remove the topsoil and that the claim against them on this point was "spurious" and "being made with malice." They asked that their alleged property rights be acknowledged and that they be awarded compensatory and punitive damages in the amount of $25,000.[7] Appellees filed a reply denying any liability on the counterclaim(s) and asserting abandonment and the statute of frauds as affirmative defenses.
The matter came on for a jury trial over several days in February, 1999, at which time each side painted starkly different pictures of their property dispute. John Dearth testified that the drainage pipes found by Sheila Jarrells, going from his property onto her land, had always been there and that he had not installed them. The witness also denied converting the topsoil from his neighbors' lot. He stated that several people had told him that Carl Perry, Helen Perry's son, "had the run of the farm" and was taking care of his mother's affairs.[8] Dearth stated that Carl gave him permission to take the soil so long as he (Dearth) would remove it by building a road to the creek at the rear of the property.
Appellants also disputed the various trespass claims against them. First, with respect to drainage from the septic system, Mr. Dearth testified that Arthur Perry had given him permission back in the 1970s to re-route the discharge from a marshy area on both their properties into the creek. Dearth further testified that when they installed a house trailer on their property in the 1990s, they also routed the septic discharge from that dwelling into the creek based on that original authorization that had allegedly been given to them by Mr. Perry. A similar explanation was given as to the garage overhang. Mr. Dearth testified that he told the Perrys several years after buying the property that he wanted to build a garage. The witness related how he expressed some concern to his neighbors that he "was going to be very close to the lot line." Dearth stated that Mr. Perry told him to use the property "as [his] own" and not "to worry about it."
Irrespective of any implied permission by their neighbors, however, appellants insisted that the garage did not encroach on the Jarrells/Perry property. Several witnesses testified that wooden posts, similar to utility poles, marked off the corners of the common boundary between the properties. Robert Schell, a registered surveyor, testified that he performed a survey for appellants in 1998 and found that the post at the front of their property sat directly on top of the boundary line and the post at the rear of the property sat inside the actual boundary. Thus, Mr. Schell concluded, the fence built by Sheila Jarrells on top of what she thought to be the boundary line was actually a "foot over" onto the Dearth property. Moreover, John Dearth testified that when he built the garage, he "strung a line from the back pole to the front pole marking the boundary line" and that the "eave spout" (overhang) of the garage was "just inside" the boundary marked by the line.
Appellees related a very different version of events, however. First, Sheila Jarrells testified that the drainage pipes now emanating from the Dearth property did not exist when she owned the lot and that she had "never" noticed anything of that nature on any of the land her parents owned when she was a child. Jarrells further cast doubt on the claim that her father had given Mr. Dearth permission to re-route the discharge line from the septic system into the creek. She explained that she and her husband had wanted to do the same thing when they owned the land and built the house, but that her "dad forbid it because he didn't want sewage where he was watering his cattle and horses."
Insofar as the removal of the topsoil was concerned, Ms. Perry firmly stated that her son (Carl) was not in charge of her affairs (and thus could not have authorized such action). She further testified that she did not give permission to remove dirt. Carl Perry also stated and denied that he had ever given Mr. Dearth permission to remove the topsoil. The witness testified that although he was present at the time the dirt was taken and used to fill the culvert, he assumed that his mother had consented to the dirt removal.
Appellees also adduced contradictory evidence with respect to the location of the boundary line between the properties and the encroachment of the garage overhang. First, Helen Perry testified that she and her husband never had any discussions with the Dearths about building a garage on the property and that no permission was ever given to them for the encroachment. Second, Mr. Thomas Schultheis, a registered surveyor, testified that he was commissioned by appellees to survey the 2.677 acre lot in 1997. The survey that he prepared shows that the Dearth garage extends over the Jarrells property by roughly six (6) inches. Mr. Schultheis also confirmed that the fence built by Ms. Jarrells was located on what he determined to be the boundary line between the two (2) properties. When asked about the survey performed by Mr. Schell for appellants, the witness conceded that surveying was not an exact science and that errors and different results were possible. Mr. Schultheis stated, however, that he re-checked his work after the Schell survey and that he reached the same result.
Finally, appellees presented the expert testimony of Mike McCarthy (a licensed real estate appraiser). Mr. McCarthy stated that he had been asked to view and appraise the 2.677 acre lot in an effort to estimate "potential value loss(es)" as a result of the damage allegedly inflicted by appellants. He estimated that the property had a "before" value of $17,500 and an "after" value of $16,500. The $1,000 diminution in value was then itemized by him as follows:
Removal of topsoil 300
Garage encroachment 100
Additional water drainage 100
Septic tank drainage 500
TOTAL 1,000
At the conclusion of trial, both sides were granted a directed verdict on the issue(s) of punitive damages. The matter was then given to the jury which returned a verdict in favor of appellees and awarding them $1,000 in damages. In addition, the jury returned interrogatories accepting the Schultheis survey (rather than the Schell survey) as the "correct survey" and finding that the Dearths had neither acquired title to the disputed strip of land by adverse possession nor removed the dirt from appellees' property with the consent of Carl Perry (acting as agent for his mother). On March 2, 1999, the trial court issued its judgement. The judgment ordered appellants to pay $1,000 in damages and fixed the boundary established in the Schultheis survey as the true border between the properties.[9]
On March 16, 1999, appellants filed a motion asking the court for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. The gist of their argument was that the jury's verdict on the issue of the contested strip of land was contrary to both the law and the evidence. They asserted that it was "undisputed" that they were told the border between the two (2) properties was marked by the wooden poles. Further, appellants argued, it was uncontroverted that they had occupied the strip for more than twenty-one (21) years.
Appellants also requested a second trial on the basis of "[n]ewly discovered evidence." This so-called new evidence was a survey prepared by a Mr. Robert Vernon and referenced at trial by Mr. Schultheis. Appellants related that Mr. Vernon's survey would corroborate their claim and Mr. Schell's expert opinion that the wooden polls marked the true boundary between the properties. Further, they accused appellees of having this survey and hiding it from them during discovery. The Dearths concluded that because this survey substantiated their other survey, it was "an important omission" that could "have affected the outcome of the trial on this issue."
Appellees filed a memorandum contra essentially arguing that sufficient evidence existed to support the jury's factual determinations. With respect to the "newly discovered" survey, appellees conceded that Mr. Vernon had been retained to perform such work, but pointed out that he was then discharged by Ms. Perry over a fee dispute for his services. An affidavit by Mr. Vernon was nevertheless included in the memorandum contra and revealed that he too had found that the Dearth garage encroached on the Jarrells/Perry property (albeit to a lesser extent than was found in the Schultheis survey).[10] The trial court rendered a decision on May 5, 1999, overruling appellants' motion for JNOV/new trial. Judgment to that effect was entered on May 12, 1999, and this appeal followed.[11]
 I
We shall jointly consider the first four (4) assignments of error as they all challenge one aspect or another of the jury's verdict and factual findings. It should be noted at the outset that a reviewing court will not reverse a judgment as being against the manifest weight of the evidence so long as it is supported by some competent and credible evidence. See Gerilo,Inc. v. Fairfield (1994), 70 Ohio St.3d 223, 226, 638 N.E.2d 533,536; Vogel v. Wells (1991), 57 Ohio St.3d 91, 96, 566 N.E.2d 154,159; C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279,376 N.E.2d 578, at the syllabus. This standard is highly deferential and even "some" evidence is sufficient to sustain the judgment and prevent a reversal. See Barkley v.Barkley (1997), 119 Ohio App.3d 155, 159, 694 N.E.2d 989, 992. The underlying rationale for affording such great deference is that the jury, as trier of fact, is better able than this Court to view the witnesses and observe their demeanor, gestures and voice inflections and use those observations in weighing the credibility of the proffered evidence. See Myers v. Garson
(1993), 66 Ohio St.3d 610, 615, 614 N.E.2d 742, 745; Seasons CoalCo. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273,1276.
We also emphasize that the weight to be given the evidence and the determination of witness credibility are issues for the trier of fact. See Cole v. Complete Auto Transit, Inc. (1997),119 Ohio App.3d 771, 777-778, 696 N.E.2d 289, 293; also seegenerally State v. Frazier (1995), 73 Ohio St.3d 323, 339,652 N.E.2d 1000, 1014; State v. DeHass (1968), 10 Ohio St.2d 230,227 N.E.2d 212, at paragraph one of the syllabus. A jury is free to believe all, part or none of the testimony of any witness who appeared before it. Rogers v. Hill (1998), 124 Ohio App.3d 468,470, 706 N.E.2d 438, 439; Stewart v. B. F. Goodrich Co. (1993),89 Ohio App.3d 35, 42, 623 N.E.2d 591, 596; also see State v.Nichols (1993), 85 Ohio App.3d 65, 76, 619 N.E.2d 80, 88; Statev. Harriston (1989), 63 Ohio App.3d 58, 63, 577 N.E.2d 1144,1147. Additionally, we note that the mere fact that testimony is uncontroverted does not necessarily require a jury to accept the evidence if the jury found that the testimony was not credible. GTE North, Inc. v. Carr (1993), 84 Ohio App.3d 776,780, 618 N.E.2d 249, 251, at fn. 3; also see State v. Caldwell
(1992), 79 Ohio App.3d 667, 680, 607 N.E.2d 1096, 1105. With these principles in mind, we turn our attention to appellant's arguments.
First, appellants assert that the jury erred in selecting the survey prepared by Mr. Schultheis as the "correct" plat of the property rather than the survey prepared by their own expert, Mr. Schell. We are not persuaded. This issue was purely a question of determining which of the two (2) competing expert witnesses was the more credible. Mr. Schultheis gave a detailed description of the manner by which he conducted his survey and explained that he re-checked his work after Mr. Schell arrived at a different result. Although the surveyors employed different methods in preparing their surveys, it is clear that the jury afforded more weight to Mr. Schultheis's work than to the work of appellants' expert. This determination was well within the jury's province as the trier of fact and we will not reverse the jury's decision on that point.
Appellants also argue that the jury erred in finding that they had not acquired title by adverse possession to that portion of their neighbors' property which the garage overhangs. We disagree. As with any other claim, the party asserting title by adverse possession bears the burden of proving such possession.See Thompson v Hayslip (1991), 74 Ohio App.3d 829, 832,600 N.E.2d 756, 758; also see Adams v. Zalek (Mar. 14, 2000), Ross App. No. 98CA2460, unreported; Central Baptist Church v. Bowles
(Sep. 9, 1997), Scioto App. No. 96CA2451, unreported. A party seeking to assert title by adverse possession must prove, by clear and convincing evidence, exclusive possession and open, notorious, continuous and adverse use for a period of twenty-one (21) years. Grace v. Koch (1998), 81 Ohio St.3d 577,692 N.E.2d 1009, at the syllabus.
Mr. Dearth testified at trial that the garage construction was completed around January 14th-15th of 1977. Given that the cause sub judice was commenced on January 16, 1998, the asserted completion date was (to the day) almost exactly twenty-one (21) years prior to filing of this lawsuit.[12] The jury may well have disbelieved appellant's evidence concerning the date of the garage's construction. In any event, as stated earlier, the trier of fact was not required to accept the testimony as true simply because it was uncontroverted. The jury obviously disregarded, or afforded little weight, to that evidence and this was its prerogative.
Appellants also challenge that portion of the jury verdict which awards damages for the drainage pipes trespass. They argue that the jury erroneously ignored evidence that "field drain pipe . . . had been installed years before by the common owner of the land." Again, we disagree. Mr. Dearth testified to the effect that the drain pipes had long been on the property. Another witness, Damon Wise, also testified concerning a "swale" and "a line or a part of a joint sticking out of the bank where the creek had washed in."[13] Ms. Jarrells nevertheless testified that no such pipe had ever been on the property. Apparently, the jury simply afforded more weight to Jarrells's testimony than it did to that of Dearth or Wise. Once again, the jury acted fully within its province.
Finally, appellants challenge that portion of the verdict which awarded damages for drainage of their septic system onto the Jarrells/Perry property. They argue that the jury improperly ignored evidence that they were given permission to discharge the water into the creek and that they acquired a prescriptive right to do so. We are not persuaded.
To begin, there are two (2) separate septic/drainage issues here. The first is with respect to the house and the second is with respect to the house trailer that was placed on the property in 1990. Insofar as the house trailer is concerned, Mr. Perry died several years before it was placed on the property and thus could not have given permission to have its septic system discharge into the creek. Furthermore, it is obvious that the new septic system for the house trailer has not been in existence long enough for acquisition of any prescriptive rights. Accordingly, we find no error in awarding damages to that extent.
With respect to the house septic system, appellants point to their evidence that Mr. Perry gave them permission in the 1970s to re-direct the septic discharge from a "marshy" area on both their properties to a creek at the back of the Jarrells/Perry property. Appellants further argue that the re-routing of the discharge line occurred more than twenty-one (21) years prior to the filing of this lawsuit and, thus, they gained prescriptive rights to maintain the drainage. We disagree.[14]
In order to acquire a prescriptive easement to drain their septic system onto their neighbors' property, appellants were required to prove that their use of the creek was open, adverse to the owners' rights, notorious, continuous and for a period of at least twenty-one (21) years. Carlyn v. Gain (1995), 105 Ohio App.3d 704,707, 664 N.E.2d 1325, 1327; Div. of Wildlife v. Freed
(1995), 101 Ohio App.3d 709, 712, 656 N.E.2d 694, 696; Pence v.Darst (1989), 62 Ohio App.3d 32, 37, 574 N.E.2d 548, 551. They were also required to show these elements by clear and convincing evidence. See e.g. Coleman v. Penndel Co. (1997), 123 Ohio App.3d 125,130, 70 N.E.2d 821, 824; J.F. Gioia, Inc. v. CardinalAm. Corp. (1985), 23 Ohio App.3d 33, 37, 491 N.E.2d 325, 330.
Appellants failed to meet that burden because, as they argue themselves in their brief, Mr. Perry gave them permission to use the property in 1973. Thus, from that date until Mr. Perry died in 1988, appellants drainage into the creek was not adverse to the rights of the owners.[15] Assuming arguendo that drainage into the creek would have ripened into adverse use after Mr. Perry's death in 1988, twenty-one (21) years had not yet elapsed before this case was commenced. Appellants therefore acquired no prescriptive rights to drain into their neighbors' creek and there was no error on the part of the jury in rejecting that argument. For all these reasons, the first, second, third and fourth assignments of error are without merit and are hereby overruled.
 II
Appellants argue in their fifth assignment of error that the trial court erred in overruling their motion for JNOV. We disagree. Our analysis begins from the standpoint that a motion for JNOV under Civ.R. 50(B) tests the legal sufficiency of the evidence. McKenney v. Hillside Dairy Co. (1996), 109 Ohio App.3d 164,176, 671 N.E.2d 1291, 1299; also see Peebles ElderlyHousing, Ltd. v. Titan Indem. Co. (Sep. 15, 1997), Adams App. No. 96CA631, unreported. The standard for granting JNOV is the same as that for granting a directed verdict under Civ.R. 50(A).Mantua Mfg. Co. v. Commerce Exchange Bank (1996), 75 Ohio St.3d 1,4, 661 N.E.2d 161, 164; Gallagher v. Cleveland Browns FootballCo. (1996), 74 Ohio St.3d 427, 435, 659 N.E.2d 1232, 1239;Pariseau v. Wedge Products, Inc. (1988), 36 Ohio St.3d 124, 127,522 N.E.2d 511, 514. That is to say that the evidence admitted at trial must be construed most strongly in favor of the nonmoving party and, where there is evidence to support the nonmoving party' s side of the case, the motion must be denied. Seegenerally Texler v. D.O. Summers Cleaners Shirt Laundry Co.
(1998), 81 Ohio St.3d 677, 679, 693 N.E.2d 271, 273; Gladon v.Greater Cleveland Regional Transit Auth. (1996), 75 Ohio St.3d 312,318, 662 N.E.2d 287, 294; Posin v. A.B.C. Motor Court Hotel,Inc. (1976), 45 Ohio St.2d 271, 275, 344 N.E.2d 334, 338. Further, the trial court may not weigh the evidence or judge the credibility of witnesses. Zavasnik v. Lyons Transp. Lines, Inc.
(1996), 115 Ohio App.3d 374, 378, 685 N.E.2d 567, 569; Atkinsonv. Internatl. Technegroup. Inc. (1995), 106 Ohio App.3d 349, 357,666 N.E.2d 257, 263; Randall v. Mihm (1992), 84 Ohio App.3d 402,406-407, 616 N.E.2d 1171, 1174.
Appellants argue that they were entitled to JNOV for many of the same reasons as were advanced in their first four (4) assignments of error.[16] However, as discussed previously, sufficient evidence exists to support the jury' s verdict and concomitant factual determinations on those points. Thus, it logically follows that sufficient evidence also exists to defeat a Civ.R. 50(B) motion. We find no error in the trial court's denial of appellants' request for JNOV and their fifth assignment of error is accordingly overruled.
 III
Appellants' sixth assignment of error is directed at the trial court' s order denying their motion for new trial. They argue that a new trial was warranted under Civ.R. 59(A) because of "newly discovered evidence" (i.e. the Vernon survey) revealed during the trial and because of the failure to disclose the existence of that survey during pre-trial discovery. We are not persuaded.
The decision to grant or deny a motion for new trial is typically relegated to the sound discretion of the trial court and will not be disturbed on appeal absent a showing of an abuse of that discretion. See e.g. Reed v. MTD Products, Inc., MidwestIndustries (1996), 111 Ohio App.3d 451, 460-461, 676 N.E.2d 576,582-583; Iames v. Murphy (1995), 106 Ohio App.3d 627, 631,666 N.E.2d 1147, 1149; James v. James (1995), 101 Ohio App.3d 668,674, 656 N.E.2d 399, 403; Bible v. Kerr (1992), 81 Ohio App.3d 225,226, 610 N.E.2d 1037, 1038. An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. SeeLandis v. Grange Mut. Ins. Co. (1998), 82 Ohio St.3d 339, 342,695 N.E.2d 1140, 1142; Malone v. Courtyard by Marriott L.P.
(1996), 74 Ohio St.3d 440, 448, 659 N.E.2d 1242, 1249; State exrel. Solomon v. Police Firemen's Disability Pension Fund Bd.of Trustees (1995), 72 Ohio St.3d 62, 64, 647 N.E.2d 486, 488. Appellate courts are admonished that, when applying the abuse of discretion standard, they must not substitute their own judgment for that of the trial court. See State ex rel. Duncan v.Chippewa Twp. Trustees (1995), 73 Ohio St.3d 728, 732,654 N.E.2d 1254, 1258; In re Jane Doe 1 (1991). 57 Ohio St.3d 135, 137-138,566 N.E.2d 1181, 1184; Berk v. Matthews (1990), 53 Ohio St.3d 161,169, 559 N.E.2d 1301, 1308. Indeed, in order to show an abuse of discretion, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias. Nakoff v. Fairview Gen. Hosp. (1996), 75 Ohio St.3d 254,256, 662 N.E.2d 1, 3.
First, we note that the Vernon survey is not as helpful to their case as appellants would have us believe. Mr. Vernon's affidavit states that the Dearth garage encroached on appellees' property by ".2 feet." Thus, his survey is not "in accord with the survey of Rob Schell" as appellants assert and we find no discernible prejudice to their case as a result of their not having this information prior to trial. We also question the extent to which this evidence was, in fact, "newly discovered." The transcript reveals several instances in which Mr. Schell (appellants' own expert) referred to the Vernon survey during his testimony. Further, even if the existence of the survey was truly new evidence, appellants could have objected to the failure to disclose that evidence as soon as Mr. Schultheis referred to it during his testimony. Appellate courts generally will not consider any error which counsel could have called but did not call to the trial court' s attention at a time when such error could have been avoided or otherwise corrected by the trial court. See LeFort v. Century 21-Maitland Realty Co. (1987),32 Ohio St.3d 121, 123, 512 N.E.2d 640, 643; Schade v. Carnegie BodyCo. (1982), 70 Ohio St.2d 207, 210, 436 N.E.2d 1001, 1003; alsosee State v. Peagler (1996), 76 Ohio St.3d 496, 499,668 N.E.2d 489, 492; State v. Gordon (1971), 28 Ohio St.2d 45,276 N.E.2d 243, at paragraph two of the syllabus. Appellants could have raised this issue with the trial court at the time the testimony was given but, instead, chose to wait until after the jury returned its verdict. We conclude that this effectively waived the matter for purposes of appeal. In any event, given that the Vernon survey simply confirmed that appellants were encroaching on the Jarrells/Perry property, we find nothing arbitrary, unreasonable or unconscionable in denying the motion for new trial. The sixth assignment of error is therefore overruled.
Having reviewed all errors assigned and argued in the briefs, and finding merit in none of them, we hereby affirm the trial court's judgment.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
HARSHA, J. KLINE, P.J.: Concur in Judgment Opinion
[1] It is not entirely clear from the record when, exactly, this acquisition took place. The instrument of conveyance was never introduced into evidence and no mention is made in any of the pleadings that would pinpoint an exact date. Ms. Perry only testified at trial that she and her husband had "lived" on the property since 1952 or 1953 when they built a home thereon.
[2] Again, there is nothing in the record to indicate when these transfers were made.
[3] The Dearth property is the first lot due west from the remainder of the 160 acres owned by appellee(s) and, apparently, the two (2) families have homes that are situated next door.
[4] Appellees described the black "stinky" stuff as "raw sewage." However, the uncontroverted evidence below was that appellants had an "aerator" hooked up to the system. An employee of the Washington County Health Department described how such an aerator worked at trial and testified that, if "functioning properly," the water emerging from the discharge line should be 97% clean. There does not appear to be any evidence in the record that the aerator was not functioning properly and, thus, the sewage would not necessarily be characterized as "raw." Nevertheless, there is no dispute that the discharge (raw or not) was being released onto appellees' land.
[5] Here again, the record is not entirely clear when this encroachment was discovered. We therefore assume that it was when the survey was completed.
[6] Ms. Jarrells was the sole owner of the land at the time this lawsuit was commenced below. The complaint nevertheless treated her and her mother as both having an ownership interest in the property. Given that this was the way the case was handled at the trial level, we will do the same here in order to be consistent and treat them both as having an interest therein.
[7] This is from their Second Amended Answer and Counterclaim. The first Answer and Counterclaim made little mention of any of these defenses and only sought damages for the filing of an allegedly frivolous lawsuit. Appellants filed a motion for leave to amend their pleading, but before such leave was granted, they filed their Second Amended [and expanded] Answer and Counterclaim as set forth above. An entry was filed by the trial court on November 12, 1998, accepting that pleading instanter.
[8] These informants were, supposedly, Helen Perry herself and her son Carl.
[9] Although there are several cryptic references made in the transcript to removal of the encroachments, the trial court made no express order with respect to their removal anywhere in the March 2, 1999 judgment.
[10] Insofar as the accusation that the survey was hidden from appellants during discovery, appellees did not address the charge directly but counsel described in the memorandum contra how he contacted Mr. Vernon after being served with the motion and verified that the survey was performed. This would suggest that there was no misfeasance on the part of counsel, but that he was unaware of the survey's existence when responding to requests for discovery.
[11] This Court acknowledges that the cause sub judice has been pending for well over a year beyond the filing of the notice of appeal. It should be noted, however, that the transcript of proceedings was in excess of 700 pages and that an extension of time was needed by the court reporter in order to prepare it for filing. Further delay was incurred when appellants sought three (3) separate extensions to file their brief. Although the appellant's merit brief was ultimately filed, appellees moved to strike the brief based upon procedural deficiencies and requested dismissal of the appeal. We overruled appellee's motion, but then granted appellants' motion to file an amended brief which was tendered on March 17, 2000. Appellees filed their brief the following month and then appellants responded with a reply brief on April 19, 2000. Thus, this case has not been languishing in this Court for as long as it would first appear.
[12] Appellants argue in their brief that the twenty-one (21) year period should be calculated from the time the garage was commenced in December of 1976. However, since it is the overhang rather than the structure itself which encroaches on appellees property, we base our calculations on the completion date.
[13] Appellants cite to the testimony of Mr. Wise in particular to support their assertion that the drain pipes had always been on the property. However, after reviewing Mr. Wise's testimony, it is (at best) unclear and does not readily support appellants' arguments on this point.
[14] We assume for the sake of argument that the trier of fact accepted Mr. Dearth's testimony that he was given permission and that the discharge line was put into the creek in the 1970s. Obviously, the jury may have chosen to disregard that testimony entirely and rule against appellants on that basis alone.
[15] Appellees' counsel framed this issue during closing argument as follows:
 "MR. BUELL: Thank you. I need to say a few words about some things that were just mentioned. First of all, I don't believe you're entitled to find that the septic system drain has been there twenty-one years. That's a matter of law. Even if permission is granted and the land is subsequently transferred to another, which happened here, the license or right to use the land of another ends. The Court has ruled it's a matter of law that the right to use that septic drain ended in 1997. You are asked only to assess what damages my client has suffered by the refusal of the Dearths to remove the pipe since they were asked to do so. The only evidence of that damage is $500 set by Mr. McCarthy.
 Which brings up another issue. How can you grant permission to do something in 1990 when you're dead in 1988. The septic was run to the creek in 1990 when the second septic was put in. And would you give permission to your neighbor to run a septic drain from his sewage system into a creek on your property."
The trial court's jury instructions provide, in pertinent part, as follows:
 "What's the second issue? There is a line from the defendants' septic tank that runs to the creek that's on the plaintiff's property. The plaintiffs' claim that this line trespasses on their property. The defendants admit that the line empties into the creek but say they had permission from one of the then owners, Mr. Arthur Perry, to put the line there.
 As a matter of law, even if permission is granted and then the land is subsequently transferred to another, the license or right to use the land of another ends. In regard to this issue, you will need to determine what, if any, damages the plaintiffs have proved they suffered as a result of the placement of that line or the failure of the defendants to remove the line after the land was transferred."
[16] Specifically, appellants assert that the evidence showed acquisition of title to the disputed strip of land by adverse possession and that the drainage pipes (tiles) were on the Jarrells/Perry property long before they moved next door.